Argued and submitted February 3, affirmed November 7, 2012

In the Matter of G. L. D., Jr.,
a Youth.

STATE OF OREGON,
*Respondent*,

*v.*

G. L. D., JR.,
*Appellant.*

Curry County Circuit Court 4488J;
Petition Number 061609GLD4, 061609GLD5,
110909GLD6, 110909GLD7, 110909GLD8;
A145535

290 P3d 852

Christa Obold-Eshleman argued the cause and filed the briefs for appellant.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Youth was adjudicated delinquent after he and two other youths broke into a high school, took computers, and set a fire. Youth appeals from the juvenile court's judgment determining that he was within the jurisdiction of the court for committing acts that, if committed by an adult, would constitute one count of first-degree arson, ORS 164.325; one count of aggravated first-degree theft, ORS 164.057; two counts of second-degree burglary, ORS 164.215; and one count of first-degree criminal mischief, ORS 164.365. Youth also appeals from the juvenile court's judgment of restitution of $194,579.92, which consisted almost entirely of amounts paid by several insurance companies due to damage and losses that the youths caused. Youth contends that (1) the juvenile court erred in failing to merge the adjudications on his two counts of second-degree burglary under ORS 161.067(3); (2) the state did not prove beyond a reasonable doubt that the value of the stolen computers was in the amount of $10,000 or more, as required for aggravated first-degree theft; and (3) insurance companies are not "victims" under ORS 419A.004(31) for purposes of restitution. We affirm.[1]

We have discretion to review this case *de novo*. *See* ORS 19.415(3)(b) ("Upon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals *** may try the case anew."). Youth does not request that we review this case *de novo*, and we decline to exercise that discretion. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Accordingly, "we review the juvenile court's legal conclusions for errors of law, but are bound by the court's finding of historical fact so long as there is any evidence to support them." *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). When the juvenile court does not make findings of fact on disputed issues of fact, but there is evidence to support more than one

---

[1] Without further discussion, we also reject youth's fourth assignment of error—the juvenile court erred in denying his motion to empanel a jury trial pursuant to Article I, section 17, of the Oregon Constitution—in light of *State v. N. R. L.*, 249 Or App 321, 277 P3d 564 (2012).

factual conclusion, we will presume that they were decided in a manner consistent with the juvenile court's ultimate conclusion. *Id*.

## I.  FACTS

Youth was charged with acts that were committed on three successive nights in October 2009 at Pacific High School, but this appeal focuses on youth's conduct on only one of the nights.[2] On that night, youth was with TM and DW, two high school friends and witnesses at youth's hearing. Youth drove them to a spot on County Shop Road, north of Pacific High School, late at night. Youth parked the car, and they walked along a trail that led to the high school. Once they reached the high school, they drank some beers and then walked over to the school's woodshop classroom. TM kicked in the classroom door, and youth went inside along with his friends. In an adjacent computer lab, youth found 19 laptop computers, owned by the high school, and the woodshop teacher's personal laptop computer.

From there, TM's and DW's testimony of the events diverged. According to TM, they loaded the computers into boxes, walked on the trail for 15 minutes back to County Shop Road, and put the computers in the car. All three youths then walked back to the woodshop classroom and poured paint thinner on the ground. Youth lit a piece of paper in TM's hand, and TM threw the paper inside the classroom.

According to DW, he was not involved in setting the fire. He testified that, after they found the computers, youth and TM loaded the computers into boxes and placed them outside the classroom. Afterwards, only youth and TM went back into the building and decided to set the woodshop classroom on fire to "get rid of the evidence." While DW was outside, youth and TM spread papers and poured paint thinner all over the classroom, and TM used a lighter to set the building on fire. Afterward, they picked up the boxes of computers and ran back to the car.

---

[2] It appears that a small amount of the restitution to the insurance companies was for repairs and losses due to youth's acts of vandalism at the school on the other nights.

As relevant to this appeal, the juvenile court held a hearing on a petition for jurisdiction over youth based on acts that, if committed by an adult, would constitute one count of arson, ORS 164.325; one count of aggravated first-degree theft, ORS 164.057; two counts of second-degree burglary, ORS 164.215; and one count of first-degree criminal mischief, ORS 164.365. At the hearing, in addition to the testimony of the state's witnesses concerning youth's commission of the acts alleged, the school district's superintendent, Lane, testified as to the amount of property damage youth had caused at the high school. Lane testified that the total cost to repair the damages to the building and to replace the shop and computer lab equipment was $193,666.91. As to the stolen computers, Lane thought they were just one year old, but the manufacturer had discontinued the model. The receipt for the purchase of the 19 replacement computers, an upgraded model, showed that the cost was $26,124.43, plus another $1,981.89 for peripherals. Lane stated that he did not know the value of the old computers at the time they were stolen, but he estimated that the purchase price of each replacement was approximately $70 or $80 less than the purchase price of each stolen computer.

After the close of the state's case, youth moved for a judgment of acquittal. Youth argued that the state had failed to meet its burden to prove that he committed aggravated first-degree theft because there was no evidence in the record that the market value of the stolen computers was $10,000 or more as required under ORS 164.057. Youth contended that, because the state failed to establish that the market value of the stolen computers could not be ascertained, the state could not rely on the value of the replacement computers to meet the statutory minimum in ORS 164.057 for aggravated first-degree theft. The juvenile court denied youth's motion for a judgment of acquittal, ruling that the state had adduced sufficient evidence that the 19 laptops were worth "well over $10,000." The court explained that, in light of year-to-year changes in computer products,

"just because they're not able to get the exact kind anymore doesn't mean that the value is nil, and * * * the replacement value was actually less than what it was to pay for those original computers, and that was $25,000. It's well over the

$10,000 mark, so the * * * motion for judgment of acquittal on Petition 008 is denied as well."

As to the events on the night of the arson, the juvenile court ruled that youth was within the jurisdiction of the court based on all acts alleged, namely, one count of arson for setting the fire, one count of aggravated first-degree theft for stealing the computers, two counts of second-degree burglary for entering the high school with intent to commit theft and intent to commit arson, and one count of first-degree criminal mischief for damaging classrooms at the school. Regarding youth's aggravated first-degree theft count, youth argued that the state had failed to prove that the value of the stolen computers was over $10,000. The juvenile court disagreed:

> "As far as the value is concerned, * * * I can reasonably ascertain the value to be well over $10,000, in fact, in the neighborhood of $25,000, and that's based on the testimony that I heard here today based on the replacement value, but also the fact that the computers were just approximately a year old and they're laptops and there's 19 of them and there's software that goes along with them and power cords and such."

Youth's counsel also argued that youth's two counts for second-degree burglary should merge:

> "I didn't do research on this, but they're the same date, same incident. Basically one alleges arson and one alleges theft. I know in the adult system, you only get one sentence out of that * * *. And I don't know if those two merge. * * * I suspect they don't because they're, you know, one's to commit arson, and one's to commit theft, but I'd make the argument that they do."

The court concluded that the two counts of second-degree burglary should not merge because there was some evidence that youth "went out and went back in" the woodshop. Youth challenges both of those rulings on appeal.

In May 2010, youth filed a memorandum regarding restitution, arguing that he should not be required to pay restitution to insurance companies because they are not victims for purposes of restitution. At the restitution hearing,

the state pointed out that youth's memorandum referenced restitution exhibits that had listed insurance companies as victims, but it explained that it had revised the exhibits to designate the high school as the victim. Nevertheless, the court entered a judgment of restitution designating the lion's share of the money for the insurance companies, as follows: $400 and $1,133 to USAA Insurance; $1,000 and $1,000 to Port Orford-Langlois School Dist. 2CJ; and $26,341.38 and $164,705.52 to Pace Liability Trust. The total restitution awarded was $194,579.92. Youth challenges the restitution awarded to the insurance companies.

## II. ANALYSIS

### A. *Merger*

We begin by addressing youth's first assignment of error that the juvenile court erred in failing to merge his two counts of second-degree burglary under ORS 164.215(1).[3] That statute provides, in part, that "a person commits the crime of burglary in the second degree if the person enters or remains unlawfully in a building *with intent to commit a crime therein.*" (Emphasis added.) The petition for jurisdiction alleged that youth unlawfully entered the high school building with the intent to commit theft (Count 3) and unlawfully entered the high school with the intent to commit arson (Count 4).

The "antimerger" statute, ORS 161.067, governs when multiple counts of a punishable offense are based on the same incident. Specifically, ORS 161.067(3) provides:

---

[3] We reject the state's contention that youth failed to preserve the issue for appeal because he neither referred to ORS 161.067(3) nor disputed whether the sufficient pause element of the antimerger statute had been met. At disposition, although he was uncertain whether the antimerger statute applied to juvenile proceedings, youth's counsel argued that the burglary counts should merge and, although he did not cite the statute, the juvenile court understood youth to argue that his conduct involved a single violation during the course of one criminal episode against the same victim. The juvenile court considered the argument and found against youth, noting that youth went in and out of the building and then returned. That is enough for preservation of this issue. *See State v. Merrick*, 224 Or App 471, 472, 197 P3d 624 (2008) (where the defendant argued that his two offenses should merge "for sentencing purposes," the defendant preserved his merger argument because the trial court actually considered whether the offenses should merge).

"When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many *separately punishable offenses* as there are violations, except that each violation, to be separately punishable under this subsection, must be *separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent.*"

(Emphasis added.) Thus, in the adult context, for multiple violations of the same statutory provision during one criminal episode against the same victim to be separately punishable, there must be a "sufficient pause" for the defendant to renounce the criminal intent.

Youth contends that the record reflects grounds for his two counts of second-degree burglary to merge. He argues that his acts in entering the high school were part of one continuous criminal episode against the same victim. Youth further argues that, contrary to the juvenile court's conclusion, the record does not support a finding that there was a sufficient pause between his unlawful entry of the building to commit the theft and entry to commit the arson that would have afforded him an opportunity to renounce his criminal intent. Because there was conflicting testimony as to whether he had left the woodshop classroom for a substantial period of time before reentering to set the fire, youth contends that the juvenile court's finding of "some evidence" that youth "went out and went back in" the building is not "proof beyond a reasonable doubt" that there was a "sufficient pause."

We do not reach the state's arguments that ORS 161.067(3) does not apply to juvenile delinquency proceedings or that, in any event, there were two separate criminal episodes, because, even if the antimerger statute applies and there was only one criminal episode, as youth contends, we would affirm based on the record in this case. That is so because we presume that the juvenile court determined disputed issues of fact in a manner consistent with its ultimate conclusion. *S. T. S.*, 236 Or App at 655. Here, there was evidence that youth had sufficient time

to renounce his criminal intent to commit arson before he reentered the workshop classroom based on TM's testimony that youth took the stolen computers back to the car parked on County Shop Road, which was an approximately 15-minute walk, and then walked back to set the fire in the classroom. Accordingly, the juvenile court did not err in determining that youth's two counts of second-degree burglary were separately punishable offenses.

B.  *Sufficiency of Evidence of Aggravated First-Degree Theft*

We now turn to youth's second assignment of error, in which he contends that the juvenile court erred by adjudicating him delinquent for acts that, if committed by an adult, would constitute aggravated first-degree theft, ORS 164.057(1). Under ORS 164.057(1), a person commits aggravated first-degree theft if

"(a)  The person violates ORS 164.055 with respect to property, other than a motor vehicle used primarily for person rather than commercial transportation; and

"(b)  *The value of the property in a single or aggregate transaction is $10,000 or more.*"

(Emphasis added.) Youth moved for a judgment of acquittal[4] based on the ground that the state failed to prove the market value of the school's computers at the time they were stolen. *See* ORS 164.115(1) (for purposes of theft statutes, "value" means market value). The juvenile court denied youth's motion, finding that the value of the stolen computers was well over $10,000.

Youth argues that the court's denial of his motion was erroneous in two ways. First, youth contends that there is no evidence in the record to establish the market value of the stolen computers at the time they were stolen. In youth's view, the only evidence of their value was their purchase

---

[4] The state points out that the appropriate mechanism to challenge the sufficiency of evidence in a juvenile proceeding is a motion to dismiss rather than a motion for judgment of acquittal. *See State ex rel Juv. Dept. v. B. M. L.*, 242 Or App 414, 419 n 6, 256 P3d 132 (2011) (noting that in a juvenile delinquency proceeding, "the correct procedural mechanism to challenge the sufficiency of evidence is a motion to dismiss[]"). As in *B. M. L.*, we treat youth's motion for judgment of acquittal as a motion to dismiss. *Id.*

price. He casts aside the evidence of the cost to replace the computers, arguing that the court could not consider it unless the state proved that the fair market value of the stolen computers was unascertainable, which the state did not do. Second, in the alternative, youth contends that, even if the juvenile court could rely on the cost of the replacement computers to establish the market value of the stolen computers, that evidence was still insufficient; replacement cost alone, without evidence that the replacement computers were equivalent to the stolen computers, does not establish the value of the stolen computers. We reach the merits of youth's arguments, determining that youth preserved them for appeal, but reject them.

According to the state, youth only argued below that the state failed to prove the value of the stolen computers was over $10,000. As a result, the state contends that youth's other arguments are not properly preserved for appeal. To preserve an issue for appeal, a party's explanation of its position must be "specific enough to ensure that the court can identify its alleged error." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Youth did argue that the court could not consider replacement cost without the state's proof that fair market value is unascertainable. We agree, though, that youth relies on one additional argument he did not expressly make to the juvenile court, namely, the cost of the replacement computers cannot be equivalent to the fair market value of the stolen computers unless they are equivalent equipment. However, we conclude that the juvenile court adequately understood youth's position that the court should not rely on evidence of the cost of the replacement computers because they were newer and an upgraded model. As explained in more detail below, the juvenile court's ruling addressed those factors directly.

Turning to the merits of youth's arguments, we first address youth's argument that the state failed to prove that the value of the stolen computers was unascertainable, as required by ORS 164.115(1). That statute governs the valuation of property for the purposes of theft statutes:

"Except as otherwise specified in this section, value means the *market value of the property at the time and place*

*of the crime*, or if such cannot reasonably be ascertained, the cost of replacement of the property within a reasonable time after the crime."

(Emphasis added.) Thus, the value of stolen property is usually "market value," *i.e.*, "what a willing buyer will pay a willing seller." *State ex rel Juv. Dept. v. Deford,* 177 Or App 555, 578, 34 P3d 673 (2001) (citing *State v. Pierce,* 153 Or App 569, 575, 962 P2d 35, *rev den,* 327 Or 448 (1998)). But if the market value of stolen property at the time of the theft cannot be reasonably ascertained, then its value can be established by "the cost of replacement of the property within a reasonable time after the crime." ORS 164.115(1).

Youth contends that the juvenile court erred by relying on evidence of the replacement cost of the computers before the state proved that the market value of the stolen computers could not be ascertained. We disagree with the apparent premise of youth's argument. Under ORS 164.115(1), if the fair market value of the stolen computers was unascertainable, the court could have accepted replacement cost *in lieu of* proof of fair market value. Youth assumes that the juvenile court accepted replacement cost instead of determining the fair market value of the stolen computers, but that is not what the court did. Instead, the court determined the fair market value of the stolen computers ("well over $10,000") using the evidence presented, including the cost of the replacement computers. To the extent youth argues that ORS 164.115(1) prevented the court from considering the cost of the replacement computers as a factor in determining fair market value, or how much the old computers would be worth to a willing buyer, we reject that argument. By its plain terms, the statute does not so limit the evidence.

Youth's alternative argument is that, even if the juvenile court could rely on the cost of the replacements to establish the value of the stolen computers, the evidence was still insufficient. In youth's view, the state failed to prove that the replacement computers were equivalent to the stolen ones, and so the replacement cost of the stolen

computers cannot establish their value at the time of the theft as a matter of law. Youth relies on *State ex rel Juv. Dept. v. H. S.*, 237 Or App 385, 239 P3d 999 (2010).

In *H. S.*, the youth stole a cell phone from the victim's car and was charged with second-degree theft. *Id.* at 387. At trial, the only evidence regarding the value of the stolen cell phone was the victim's testimony that its replacement cost was $50. We noted that "[a] piece of stolen property can be 'replaced' by a piece of property of much lesser or greater value"; and for the replacement property to establish the value of the stolen property, "the characteristics of the properties relevant to their effectiveness or utility must be similar[.]" *Id.* at 390. We concluded that the victim's testimony of the replacement cost, by itself, was legally insufficient to establish that the stolen cell phone was worth $50 "because there was no evidence that the two phones were similar in ways relevant to their effectiveness or utility." *Id.* In *H. S.*, we held that, to prove the value of stolen property through evidence of the cost of replacement property, "the state must prove that the stolen property and the replacement property are of 'equal effectiveness' or have the 'same utility.'" *Id.* at 389.

Youth's reliance on *H. S.* is misplaced. Youth overlooks that the issue in that case was whether the evidence was sufficient to establish "cost of replacement." *H. S.*, 237 Or App at 389. This case, however, does not involve a valuation based on "cost of replacement." Rather, this is a "fair market value" case, and one in which the state presented other evidence of the fair market value of the stolen computers. Although youth argues that the replacement computers were an upgraded model and were new, those differences factor into the weight or value of the evidence concerning the replacement computers but would not preclude the court from considering that evidence, in conjunction with other evidence, in its determination of the fair market value of the stolen computers.

We also conclude that there was sufficient evidence in the record for the court to find that the fair market value of the 19 computers that youth stole from the computer lab exceeded $10,000. Lane explained that, because the

model of the stolen computers had been discontinued, the high school purchased an upgraded model from Dell, with Windows XP Professional software and other accessories, which was less expensive than the purchase price of the stolen computers. Lane also provided the cost of the replacements, noted that the purchase price of each stolen computer was $70 or $80 higher, and testified that the stolen computers were approximately one year old. The juvenile court could estimate the purchase price of the old computers, with peripherals, was over $29,000 based on Lane's testimony, and knew the cost of the new computers with peripherals, approximately $28,000. The juvenile court implicitly concluded that, because of the technological advancements in the computer industry, the high school replaced its computers with a different but similar model from Dell with similar functionality at a slightly lower price. The court did and was entitled to conclude from all of the evidence that the fair market value of the one-year old stolen computers exceeded $10,000, approximately one-third of their price when new. The juvenile court did not err in concluding that youth was within the jurisdiction of the court for committing acts, that if committed by an adult, would constitute aggravated first-degree theft of property worth $10,000 or more.

## C.  *Restitution to Insurance Companies*

Lastly, youth assigns error to the portion of the juvenile court's judgment awarding restitution of $192,579.92 to two insurance companies that paid for damages and losses that youth and his companions caused.[5] Youth contends that an insurance company is not a "victim" for purposes of restitution in juvenile proceedings under the juvenile code's definition of that term, and that

---

[5] After youth filed his notice of appeal, the juvenile court amended its restitution judgment and ordered youth to pay restitution directly to the high school and the high school's woodshop teacher instead of to the insurance companies. We requested supplemental briefing to address the import of that amended judgment. In a joint memorandum, the parties agree that, because the juvenile court's entry of the amended judgment did not comply with the requirements of ORS 419A.200(7), the court lacked jurisdiction to enter it. *See* ORS 419A.200(7)(a) ("[T]he filing of an appeal does not *** preclude the juvenile court *after notice and hearing* from entering such further orders relating to the ward or youth offender's custody." (Emphasis added.)). Accordingly, the original restitution judgment entered on July 28, 2010, is the operative judgment on appeal.

definition rightfully applies. He argues that our decision to the contrary in *State v. E. V.*, 240 Or App 298, 302, 246 P3d 78 (2010), *rev den*, 350 Or 130 (2011), merits a second look and should be overruled because authority not cited in that opinion, namely, *State ex rel Juv. Dept. v. Z. D. B.*, 238 Or App 377, 242 P3d 714 (2010), undercuts *E. V.*'s holding.

In *E. V.*, we explicitly rejected youth's argument that the definition of "victim" in the juvenile code, ORS 419A.004(31), governs for purposes of restitution in juvenile proceedings. We explained:

> "As discussed above, the Juvenile Code expressly incorporates the Criminal Code's definition of 'restitution,' which, in turn, includes a special definition of 'victim.' That statutory framework has been in place since 1993. Or Laws 2009, ch 33, § 2. *Nothing in the text of ORS 419A.004(31), HB 2127, or its legislative history indicates that the general definition in ORS 419A.004(31) was intended to alter our understanding that the definition of 'victim' in ORS 137.103(4) applies in this context* and, to conclude otherwise, would have the effect of limiting those who could be awarded restitution in juvenile delinquency cases."

*E. V.*, 240 Or App at 303 n 1 (emphasis added). We held that, for purposes of juvenile restitution in ORS 419C.450(1)(a), the legislature, by incorporating the definition of "restitution" under the Criminal Code, also incorporated the definition of "victim" under the Criminal Code in ORS 137.103(4). 240 Or App at 302. Under the Criminal Code, the term "victim" expressly includes an insurance carrier of a victim. ORS 137.103(4)(d) (a victim includes an "insurance carrier, if it has expended moneys on behalf of a victim described in paragraph (a) of this subsection").

Youth, however, contends that our decision in *Z. D. B.* conflicts with our holding in *E. V.* Youth argues that our decision in *E. V.* was based, in part, on the legislature's intention to give the term "restitution," including the definition of "victim," the same meaning in criminal and juvenile proceedings; but, in *Z. D. B.*, our holding allows more victims to obtain restitution awards in juvenile cases than in criminal cases. Although youth may be correct about the consequences of our holding in *Z. D. B.*, we disagree with

youth's suggestion that *E. V.* is in conflict with *Z. D. B.* on the question of the proper definition of a "victim" for purposes of restitution.

In *E. V.*, we addressed whether, for purposes of restitution, the terms "restitution" and "victim" have the same meaning in the criminal and juvenile codes and determined that the legislature intended those terms to have the same meaning in both proceedings. Our decision in *Z. D. B.* does not undercut the holding in *E. V.* on that point. We addressed a different issue in *Z. D. B.*, the causation requirement in ORS 419C.450(1)(a) (restitution awarded when a youth offender "caused another person any physical, emotional or psychological injury or any loss of or damage to property"). We held, in accordance with an earlier case, *State ex rel Juv. Dept. v. Dickerson*, 100 Or App 95, 97, 784 P2d 1121 (1990), that the state need only show (1) criminal activity, (2) pecuniary damages, not a specific loss that is alleged and adjudicated, and (3) a "but for" causal relationship between the two. 238 Or App at 382-83. Accordingly, *Z. D. B.*'s holding does not conflict with our holding in *E. V.* that it was the legislature's intent to apply the same definitions of restitution and victim to criminal and juvenile cases, and we decline to overrule *E. V.*

In light of our conclusion in *E. V.*, the definition of victim in ORS 137.103(4)(d) governs in this case, and, therefore, insurance companies are victims for purposes of restitution in juvenile proceedings. As a result, the juvenile court did not err in imposing a restitution award to insurance companies.

Affirmed.